UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NEW YORK

RICHARD EDELMANN,

                          Plaintiff,

v.

KEUKA COLLEGE,

                          Defendant.

**DECLARATION OF RICHARD EDELMANN**

Index No.: 6:16-cv-06293

**RICHARD EDELMANN,** hereby declares the following under penalty of perjury:

1. I am the plaintiff in this matter.

2. As such, I am fully familiar with the facts and circumstances of this litigation.

3. I am a resident of Wayne County, New York.

4. I make this affidavit in reply to Defendant's response to my motion for summary judgment, and in further support of my motion for summary judgment.

## ACTUAL JOB DUTIES AT KEUKA COLLEGE

### A. I Did Not Design the Mac Network

5. Defendant claims that I was the "architect" of Keuka College's (the "College") Mac computer network. Initially, there was no separate "Mac network" at the College. There was a single College network, and in 2012 a Mac server was installed and used to integrate the College's Mac computers into the College's network. Nevertheless, for simplicity's sake, I will use the phrase "Mac network" to refer to these Mac computers and server and their overall integration into the College's network.

6. Although I was the Mac vendor's typical contact person at the College, I was not an "architect" of any kind. The fact is, I simply did not possess the skills to design a network and install and maintain a server. Indeed, I was always encouraged to take Mac-related training courses for more basic tasks. *See* **Exhibit G** to the May 3, 2019 reply Declaration of Peter J. Glennon ("Glennon Reply Decl.").

7. This is why the College was always supported by outside Mac vendors. It was the Mac vendor who came on-site at the College in 2012 for the server installation. And it was the Mac vendor who explained what equipment and hardware the College would need. In fact, when we first decided to purchase and install a Mac server, several conference calls were conducted with the Mac vendor to discuss their process and what they would need from the College, if anything. I was one of the individuals who sat in on those phone calls. Also on the calls were my supervisor Andy Hogan and Casey Kendall, who was the head of Information Systems and Security, which is the department that managed more complex server-related issues. *See* **Exhibit D** to the Glennon Reply Decl. at KEUKA15266.

8. The Mac vendor designed the network based on the needs of the College. I acted as the designated go-between during this process, relaying the Mac vendor's specifications, instructions, and recommendations to my supervisors at the College. I was just a messenger and simply repeated the Mac vendor's communications. When the Mac vendor came on-site to install the server, I was the person in the IT Department assigned to meet with the vendor and observe the set-up so that I could have the vendor explain answers to any questions that my supervisor(s) might have about the new system. *See* Exh. D to Glennon Reply Decl.

9. I did not design the network or install the server. I was simply passing along to Mr. Hogan and Ms. Kendall what the Mac vendor had explained to me and recommended to the College. And other higher-ups in the IT Department, such as Andy Hogan and Casey Kendall, were aware of this throughout the process.

10. That Mac vendor explained basic network troubleshooting steps to me. But if there were any significant issues, I had to contact the Mac vendor so that they could remote in and fix the issue or direct me to assist them in fixing the issue. *See* Exh. D to Glennon Reply Decl.

11. In fact, my annual evaluations always indicated that I needed Mac computer training. *See* Exh. G Glennon Reply Decl.

12. When I was terminated from the College and was searching for another Information Technology ("IT") job, I did create a narration of my work with the College's Mac network. I never claimed that I had created the network without support, but I did my best to highlight and relate my exposure to the process in hopes of obtaining another position in the IT field. Notice that I used "we" in referencing the network development. *See* Exhibit H to the March 7, 2019 Declaration of Jeremy M. Sher.

13. Although I applied for approximately thirty (30) IT jobs after leaving the College, and was interviewed for many of these open positions, I never again obtained employment in the IT field.

**B. Audio Visual Duties**

14. As explained in my January 7, 2019 affidavit, a significant portion of my

actual duties at the College consisted of Audio Visual ("A/V") related tasks, most frequently in-person A/V event support. I would set up conference phones, microphones, and video cameras.

15. When I first joined the College in 2010, the College was attempting its first round of A/V upgrades in some time. I did not know enough about A/V technology at the time to meaningfully participate in this process. Instead, Timothy Pierson, Andy Hogan, and Brad Turner worked with a vendor on the initial design of classroom technology upgrades in or about 2010-2011.

16. Similarly, I did not design the College's classroom A/V technology. Rather, during my time at the College, the College used the company Presentation, Communication, Collaboration ("PCC") to act as the College's A/V technology vendor and installer. In fact, in later years, when the A/V upgrades became somewhat more complex, the College hired a second vendor, Lantek Audio, Video, and Communications to supplement the work performed by PCC. *See* **Exhibit H** to Glennon Reply Decl. at KEUKA01436, KEUKA01667, KEUKA08669, KEUKA24013, KEUKA27994, KEUKA28155, KEUKA28210, KEUKA36670, KEUKA38340, KEUKA40994, KEUKA41256, KEUKA41280, KEUKA41335, KEUKA42263, KEUKA51493, KEUKA51807, KEUKA18146 and KEUKA32973.

17. It was Andy Hogan who was the main point of contact for these vendors. In later years, when I had become more knowledgeable regarding the College's A/V technology generally, on occasion, myself or other IT Department staff would communicate with these vendors on an as-needed basis, at Andy Hogan's direction. I would then faithfully relay the vendor's recommendations to Andy Hogan, who made the

ultimate decision. These vendors had far more A/V technology knowledge than I. I never departed from their instructions and recommendations, nor did I advise any other College employee to do so. I never used independent judgment or discretion in these tasks.

18. I did occasionally assist with classroom upgrades, but only for simple tasks where it would not have made sense to contact either of the vendors, such plugging in conference telephones.

19. All larger or "holistic" classroom upgrades were completed by the vendor, with one exception during my employment with the College.

20. On that one occasion during the period of my employment, PCC was unable to schedule and complete a classroom upgrade installation in the time required by the College, so I completed the installation, with full telephone support from PCC. PCC provided me with all the necessary instructions and walked me through each step. I worked on this upgrade for two full days, whereas such an upgrade would typically have taken PCC around a half-day to complete.

21. Defendant references "Extron" technology in their response papers. *See* Defendant's Local Rule 56 Counterstatement of Facts at page 9. This was the brand of control panel in use in the College's A/V equipped classrooms, at least later in my period of employment with the College. These control panels allowed users to press a button to lower or raise projector screens, adjust speaker volumes, and turn projector lights on and off. These control panels came pre-programmed from the company and we would simply plug them in them at the podiums in the A/V equipped classrooms. This was also one of the few A/V installation tasks we could perform without one of the outside vendors.

22. I do not recall remotely accessing these control panels personally.

Regardless, I believe it was possible for a person to log into a software program that could allow them to click a box to lower or raise screen projectors, adjust speaker volumes, and turn projector lights on and off. This is a task that could have been completed by any help desk employee, and indeed any individual without a login who simply chose to walk to a classroom and push a button instead of signing into a remote access program to click the appropriate box.

23. Although I was the employee assigned to work A/V for most of the College's events, the entire IT Department received training on the classroom A/V equipment and the Extron control panels. I was not uniquely skilled or trained in this regard.

C. **Daily Duties Performed**

24. During my employment at the College, I typically arrived at work at 6:30 A.M. Because I was almost always the first employee in the office, I would be the first to review the service tickets that had been submitted since the office had closed the day before.

25. Different individuals and departments in the greater IT Department handled different types of problems. For example, A/V problems were typically handled by me in my department, User Services/Classroom Technology. But a wireless network problem would typically be handled by the Information Systems and Security Department, which had people with higher level skills and abilities than me.

26. When I first began working at the College, Timothy Pierson or Andy Hogan instructed me as to who, or which department, was responsible for handling each type of problem, and to what person or department I should forward each kind of service

request. Over the years, the specific individuals would change due to turn over, promotions, etc., but it was generally understood who and which departments were responsible for which types of IT service requests. If I was ever uncertain about who would handle a particular service request, I would ask Andy Hogan or other department heads to whom I should refer the request.

27. It is true that as the first employee at the office, I would collect and distribute the service tickets to the appropriate individuals and departments. But this ministerial task was simply a result of my arrival time, and when other requests came in throughout the day, any help desk worker could and did distribute these service tickets, as well.

28. I could never require anyone to whom I gave a service ticket to actually follow-up on the service request. That was up to their respective supervisor(s). Once I provided the service ticket to the individual or department that I believed would be responsible for that particular type of task, I rarely inquired as to the status ever again.

29. There were also occasions when I gave a service ticket to the wrong individual or department and was corrected by my supervisor, Andy Hogan, or other department heads. I did not always correctly distribute the service tickets.

30. Of course, there were times that I received service tickets requesting help in an area that I could handle without input from my supervisor, such as a password reset, burned out projector bulb, or basic software program installation, all of which were typical of the majority of my actual duties. Therefore, I did sometimes take responsibility for those tickets myself, but if any problem seemed more complex, or would require the College to expend funds, I always sought out my supervisor, Andy Hogan, for direction.

D. **Domain Level Access**

31.     The Defendant also stated in its response that I had "domain level access" while employed by the College. *See* Declaration of Andrea Campbell, dated March 7, 2019, ¶ 5. It is true that I had domain level access, or as it is more commonly known, administrative rights, at certain times, and for certain purposes. To my understanding, this was true of every IT employee, other than the student workers, due to the relatively small size of our IT Department.

32.     The average user of the College's computers could not simply download new programs to the College's computers. Otherwise, students and faculty could have downloaded whatever programs they wished, exposing the College's computers to viruses and other potential problems. The IT Department employees, however, had administrative rights so that they could download new programs such as Photoshop or update a computer's operating system to its most current version.

33.     I had full administrative rights for the Mac computers and server. I had to in order to assist the Mac vendor when they performed upgrades or troubleshot issues. Otherwise, I typically used those rights to perform simple tasks such as creating a new user account or resetting a password. If the task was more significant, such as creating a new user group, I would speak with my supervisor, Andy Hogan, to obtain permission and guidance to perform the task. And as I have previously stated, I would also seek support from the outside Mac vendor to instruct me with these tasks once I obtained my Mr. Hogan's approval.

34.     I had more limited administrative rights for the Windows computer

network, and typically the only tasks I would perform on those computers or on that server were password resets, creating user accounts, and downloading new applications.

35. It may be true that I had full domain level access, or administrative rights, while at the College, at least for the Mac computers and server. Although this may mean that I could have done many complex things on these computers and on the server, the fact is that I did not, for the simple reason that I did not know how and was not qualified to do so. Such hypothetical tasks presented by Ms. Campbell were not a part of my actual duties.

36. I cannot speak to the College's reasoning behind giving every IT Department employee domain level access, other than to suggest that it obviated the need to seek a supervisor's permission, and have a supervisor come to log in, to a computer or server every time a basic task was to be completed. I only know that almost every, if not every, full-time IT Department worker had some level of administrative rights to the College's computer system, and that to my knowledge, this is typical of many IT employees, including help desk workers.

**E. EMS Core Committee**

37. I readily admit that I was the IT Department's "liaison" to the EMS Core Committee (the "Committee"). Unfortunately, this position was not nearly as prestigious as it sounds.

38. The College had its own software for reserving classrooms and event spaces called the Electronic Management System ("EMS"). Whenever a professor, student organization, or college department, such as admissions, needed to reserve a

particular room or meeting space at the College, they would do so by logging into the EMS application and reserving the date, time, room, and AV equipment that they wanted.

39.     The Committee was formed by the College's Conference Services to facilitate clear communication between departments regarding this reservation of rooms and AV equipment. The Committee met once per month, and it was led by the head of Conference Services, Karen Mann, and one other individual. Each department in the College such as admissions, student affairs, and alumni relations, had a "liaison" whom they sent to the meeting to relay their department's comments and concerns regarding any changes or improvements that could be made to the event space reservation process. I was chosen as the IT Department's liaison because I was the most knowledgeable AV person in the IT Department. I was therefore in the best position to update the list of available equipment that could be reserved, and listen to any feedback regarding the AV equipment from the other departments.

40.     In addition, I would take notes at the Committee meeting regarding any users' questions, comments, and concerns that had to do with the software rather than the AV equipment. Then, I would relay those questions, comments, and concerns to the Information Systems Department (usually to Casey Kendall, specifically) within the College's greater IT Department. This Information Systems Department was responsible for programming, upgrading, and supporting the EMS application. I never programmed, upgraded, or troubleshot the EMS software.

41.     Rather, I was the designated IT Department employee instructed to attend the meeting and report back regarding any glitches the users were experiencing and any suggestions they had. It was then up to the Information Systems Department to analyze

those problems and come up with a solution, if possible. That was the extent of my "liaison" role.

### F. I Do Not Have Any Cisco CCNA Certifications

43. In my previous affidavit, dated January 7, 2019, I stated that I obtained two basic Cisco certifications between 2002 and 2010. However, upon further reflection and review of my files, I realized that I was mistaken.

44. I obtained a Network Technician certificate from Wayne-Finger Lakes BOCES in 2002, but this is not a Cisco certification.

45. I studied for two Cisco certifications, CCNA1 and CCNA2, in or about 2010. At the time, I hoped to take the tests and expected to obtain my certifications in or about 2010, an expectation that I referenced in my resume at the time.

46. I never obtained these certifications. Instead, I began working at the College and no longer had the time to study for these certifications.

47. Defendant stated that I possessed a CCNA certification in their Local Rule 56(a)(2) Opposing Statement. But the fact is that although I hoped to obtain such a certification, I never did.

Dated: May 3, 2019
       Rochester, New York

                                                                                                      */s/ Richard Edelmann*
                                                                                                       Richard Edelmann