UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
───────────────────────────────────

RICHARD EDELMANN,

                                    Plaintiff,

                                                              Case # 16-CV-6293-FPG

v.

                                                              DECISION AND ORDER

KEUKA COLLEGE,

                                    Defendant.
───────────────────────────────────

## INTRODUCTION

      Plaintiff Richard Edelmann brings this wage-and-hour action against his former employer, Defendant Keuka College, alleging that Defendant misclassified him as an employee exempt from overtime wage requirements. ECF No. 1. He raises claims under both the Fair Labor Standards Act ("FLSA") and New York Labor Law ("NYLL"). Before the Court are three motions: (1) Plaintiff's motion for summary judgment (ECF No. 42), (2) Defendant's motion to strike (ECF No. 54), and (3) Plaintiff's motion to reopen expert discovery (ECF No. 58). The Court resolves all these motions in this omnibus order. For the reasons that follow, Plaintiff's motion for summary judgment is DENIED, and Defendant's motion to strike is GRANTED, and Plaintiff's motion to reopen expert discovery is DENIED.

## LEGAL STANDARD

      Summary judgment is appropriate when the record shows that there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Disputes concerning material facts are genuine where the evidence is such that a reasonable jury could return a verdict for the

non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In deciding whether genuine issues of material fact exist, the court construes all facts in a light most favorable to the non-moving party and draws all reasonable inferences in the non-moving party's favor. *See Jeffreys v. City of New York*, 426 F.3d 549, 553 (2d Cir. 2005). However, the non-moving party "may not rely on conclusory allegations or unsubstantiated speculation." *F.D.I.C. v. Great Am. Ins. Co.*, 607 F.3d 288, 292 (2d Cir. 2010) (quotation omitted).

## BACKGROUND

Defendant is an institution of higher education located in Keuka Park, New York. It is undisputed that Defendant is an employer covered by the FLSA and NYLL. In April 2010, Plaintiff began working in Defendant's Information Technology ("IT") group through a temporary employee agency. In June 2010, Plaintiff became a full-time employee with Defendant as a Senior Technology Support Technician ("Senior Support Tech"). Throughout his employment, Defendant treated Plaintiff as a salaried employee exempt from overtime requirements.

The crux of the parties' factual dispute concerns the nature and complexity of Plaintiff's job responsibilities. Around the time of Plaintiff's hiring, Defendant created a job description for the Senior Support Tech position. In the section titled "General Responsibilities," it stated:

> Responsible for providing direct support for all Desktop Systems, application, peripherals or other technologies as required by the student, academic or business communities of Keuka College. Responsibilities include effective and timely support, both preventative and remedial, of MAC, Windows and LINUX/UNIX systems and their associated peripherals, applications, networks and Sub-systems.

ECF No. 49-6 at 1. The "Specific Responsibilities" included:

> To provide the highest levels of technical and customer support to all Departments and personnel associated with Keuka College:
>
> - Serve as Technical Lead within a Dynamic and effective Helpdesk team.
> - Provide technical support to other team members. . . .

2

- Provide Operating Systems Support for MAC OS[, Microsoft Windows, and LINUX] to include design, installation, upgrade, and remedial support.
. . . .
- Provide Hardware Support for all MAC, Intel or other Platforms, to include design, installation, upgrade and remedial support.
- Configure Desktop Network.
- Install, configure, upgrade and troubleshoot Desktop Network issues, to include, TCP/IP, VPN, RAS, DNS or DHCP.

*Id.* Qualifications for the position included "Associates preferred," "Industry Training towards Certification in Technical Discipline," with three years of "related experience," excellent communication and troubleshooting skills, and experience with "Windows and MAC Operating Systems and Hardware." *Id.* at 2.

Timothy Pierson, who led Defendant's IT group and created the Senior Support Tech job description, explained that the employee would do more than solve discrete computer issues for faculty, staff, and students. *See* ECF No. 49-5 at 17 (stating that the Senior Support Tech would do more than "replace [a] hard drive" or set up a computer "for somebody"). The Senior Support Tech would need to analyze and upgrade the college's technology, which encompassed designing technical changes to managing the new systems once installed. *See id.* at 17-18.

Plaintiff alleges that, in practice, his duties were not as high-level or technically sophisticated. He states that his primary duty was "general desktop and help desk support and audio/video[] support." ECF No. 42-6 ¶ 18. He states "60% of [his] job duties consisted of help desk and desktop support," which entailed "analyzing and troubleshooting non-complex computer software and hardware problems." ECF No. 42-4 at 4. For example, Plaintiff "completed tasks such as repairing malfunctioning printers, assisting with password resets, and assisting students, faculty, and staff with downloading and troubleshooting software issues with programs such as Microsoft Word and Excel, and the user's email applications, such as Outlook or Gmail." *Id.* 30% of his job was "running A/V support, such as ensuring that projectors and screens were set up for

3

PowerPoint presentations and that microphones were available and operational for speakers." *Id.* at 6.

Andrea Campbell, Defendant's Chief Information Officer, testified that Plaintiff's core job responsibilities stayed the same throughout his tenure. His "general tasks" included "computer-based support, operating system installation," "working on the network and user accounts," "help desk," and "classroom support." ECF No. 42-3 at 75. But Defendant goes on to allege that Plaintiff's key duties were consistent with those Pierson envisioned for the position: designing and implementing various projects to improve and maintain the college's technological infrastructure.

For example, one of Plaintiff's major projects involved integrating Apple computers into Defendant's network, which occurred approximately one year into his employment. Andrew Hogan, Plaintiff's supervisor, described Plaintiff as the "architect behind the Apple environment at Keuka." ECF No. 49-8 at 16. Hogan claims that—with assistance from third-party vendors—Plaintiff "designed" the Apple "server environment." *Id.* at 17. Once the proposed design was confirmed, Plaintiff recommended what hardware to use to implement the design, installed the hardware, and subsequently maintained the Apple environment and computers. *Id.* at 12, 20, 24; *see also* ECF No. 49-9 at 12. Hogan also claims that, even before the installation of the new Apple server, Plaintiff managed the Apple products on campus. *See* ECF No. 49-8 at 14. Campbell likewise states that Plaintiff was "in charge" of the Apple environment. ECF No. 49-9 at 8.

Plaintiff does not view his role on the Apple project as that of an architect or designer. He avers that before the project, his work with Apple computers consisted of "basic help desk support." ECF No. 42-4 at 5. When Defendant pushed to integrate Apple hardware with its network, he "was not responsible for installing or upgrading [that] equipment." *Id.* Indeed, the "vast majority of th[e] work was done by an outside vendor, who [he] assisted." *Id.* Later, Plaintiff

4

helped to maintain the Apple server, but "always with the assistance of the outside vendor when any complex or serious problem arose." *Id.* Thus, Plaintiff's "involvement with the College's Mac computers was largely the same as [his] involvement with any other computer on campus": basic troubleshooting and technical support. *Id.* at 5-6.

Similarly, Defendant portrays Plaintiff's A/V-support duties differently than Plaintiff does. Hogan testified that Plaintiff "maintained the foremost level of expertise at the institution regarding classroom technology." ECF No. 49-8 at 36. Plaintiff managed the integrated controls system that unified the classroom technologies throughout the campus, and he was part of a committee that helped to maintain, change, and upgrade the college's event management system. *Id.* at 7-9, 36-37. Furthermore, Pierson believes that Plaintiff played a role in designing and implementing classroom-technology upgrades in 2010 and 2011. ECF No. 49-5 at 78. Defendant also claims that Plaintiff trained, supervised, and scheduled several work-study students who assisted with A/V projects around the campus. ECF No. 49-8 at 7. By contrast, Plaintiff asserts that the work-study students reported to Hogan and that he only handled some minor scheduling conflicts when they arose. *See* ECF No. 42-4 at 8.

In terms of his help-desk role, Campbell states that Plaintiff acted as a "senior technician" who could resolve more complex issues than those handled by work-study students, including any complex issues involving "a server or network." ECF No. 49-2 at 1. Plaintiff would often need to "test, configure, and maintain [the college's] computer network and server" and "correct problems where users were unable to access the network." *Id.* at 2. Again, Plaintiff disputes the complexity of his role. *See* ECF No. 42-4 at 4.

Regardless, in November 2015, Defendant eliminated Plaintiff's position and terminated his employment. Plaintiff brought this action in May 2016.

5

**DISCUSSION**

The parties' narrow dispute is whether, by virtue of his job duties, Plaintiff's position was exempt from the overtime requirements of the FLSA and NYLL. Plaintiff alleges that his position was not exempt and that Defendant owes him wages for unpaid overtime.

"Under the FLSA, employees must be compensated for every hour worked over forty per week 'at a rate not less than one and one-half times the regular rate at which he is employed.'"[1] *Clarke v. JPMorgan Chase Bank, N.A.*, No. 08 Civ. 2400, 2010 WL 1379778, at *15 (S.D.N.Y. Mar. 26, 2010) (quoting 29 U.S.C. § 207(a)(1)). "However, the FLSA provides that certain categories of employees are exempt from its overtime requirements." *Id.* Whether an employee meets an exemption presents a mixed question of law and fact. *See id.* "The question of how an employee spends his or her time working is one of fact, while the question of whether those work activities exempt him or her from the FLSA is one of law." *Flood v. Just Energy Mktg. Corp.*, 904 F.3d 219, 227 (2d Cir. 2018). As the employer, Defendant bears the burden of proving that Plaintiff falls within the ambit of an exemption. *See id.*

Here, Defendant invokes two exemptions: the "computer employee" exemption and the "administrative" exemption. *See* ECF No. 49 at 17, 23. The Court discusses each in turn.

**I. Computer Employee Exemption**

The "computer employee" exemption exempts any employee who is "a computer systems analyst, computer programmer, software engineer, or other similarly skilled worker, whose primary duty is":

> (A) the application of systems analysis techniques and procedures, including consulting with users, to determine hardware, software, or system functional specifications;

---

[1] The parties agree that the same exemptions and standards apply to Plaintiff's NYLL claim, so the Court need only analyze the FLSA claim. *See Clarke v. JPMorgan Chase Bank, N.A.*, No. 08 Civ. 2400, 2010 WL 1379778, at *7 (S.D.N.Y. Mar. 26, 2010).

> (B) the design, development, documentation, analysis, creation, testing, or modification of computer systems or programs, including prototypes, based on and related to user or system design specifications;
>
> (C) the design, documentation, testing, creation, or modification of computer programs related to machine operating systems; or
>
> (D) a combination of duties described in subparagraphs (A), (B), and (C) the performance of which requires the same level of skills . . . .

29 U.S.C. § 213(a)(17)(A)-(D).

"The term 'primary duty' means the employee's 'principal, main, major or most important duty." *Clark*, 2010 WL 1379778, at *16 (quoting 29 C.F.R. § 541.700). A court must look at "all the facts in a particular case" to determine the employee's primary duty, "with major emphasis on the character of the employee's job as a whole." 29 C.F.R. § 541.700(a). "Factors to consider when determining the primary duty of an employee include" the "relative importance of the exempt duties as compared with other types of duties; the amount of time spent performing exempt work; the employee's relative freedom from direct supervision; and the relationship between the employee's salary and the wages paid to other employees for the kind of nonexempt work performed by the employee." *Id.* The regulations emphasize that while the "amount of time spent performing exempt work can be a useful guide in determining" the employee's primary duty, it is not the "sole" test and nothing "requires that exempt employees spend more than 50 percent of their time performing exempt work." *Id.* § 541.700(b).

The activities listed in Section 213(a)(17) generally pertain to the highly skilled work of designing or creating computer systems or programs to meet the business's needs—*e.g.*, applying "systems analysis techniques . . . to determine . . . functional specifications," designing "computer systems or programs . . . based on . . . user . . . design specifications," and creating "computer programs related to machine operating systems." 29 U.S.C. § 213(a)(17)(A)-(C); *see, e.g.*, *Clarke*,

2010 WL 1379778, at *17 (exempt employee "develop[ed] disk space remediation plans" for organization's data centers, analyzing "the space available on the current frame, the clusters that the frame was connected to, future frame growth, frame decommission, [backup] needs and the viability of moving between frames"); *Olorode v. Streamingedge, Inc.*, No. 11 Civ. 6934, 2014 WL 1689039, at *22 (S.D.N.Y. Apr. 29, 2014) (exempt employee "tailor[ed] the operating system to meet [other employees'] particular needs"); *Campbell v. Kannapolis City Schs. Bd. of Educ.*, 55 F. Supp. 3d 821, 824 (M.D.N.C. 2014) (exempt employee was "responsible for designing and implementing [computer networks] in a school environment"); *Haluska v. Advent Commc'ns, Inc.*, No. 13-CV-1104, 2014 WL 5823105, at *7 (W.D. Pa. Nov. 10, 2014) ("[The employee's] primary job duties included consulting with customers . . . to discuss and determine hardware specifications and system functions as well as . . . modifying the related software to meet their needs . . . .").

By contrast, tasks like installing new software, configuring software and hardware, and troubleshooting problems with applications, networks, and hardware—all of which involve computers but require a lesser degree of technical know-how and sophistication—do not fall within the exemption. *See, e.g.*, U.S. Dep't of Labor, Wage & Hour Div., Opinion Letter, 2006 WL 3406603, at *5 (Oct. 26, 2006) (stating that an "IT Support Specialist"—whose duties include "installing, configuring, testing, and troubleshooting computer applications, networks, and hardware"—is not an exempt position) [hereinafter "DOL Opinion Letter"]; *Hunter v. Sprint Corp.*, 453 F. Supp. 2d 44, 52 (D.D.C. 2006) (stating that a "technically proficient help-desk employee" does not fall "within the ambit of a provision that is designed to exempt computer programmers, network designers, and software developers"); *Strauch v. Computer Scis. Corp.*, No. 14-CV-956, 2018 WL 4539660, at *3 (D. Conn. Sept. 21, 2018) (employee who merely maintained existing backup and recovery systems for organization did not engage in exempt activity).

That being said, some courts have also classified "complex" troubleshooting as an exempt activity. *See, e.g.*, *Friedman v. Nat'l Indem. Co.*, No. 16-CV-258, 2018 WL 1954218, at *4 (D. Neb. Apr. 13, 2018) ("[C]ourts have routinely found that analyzing computer systems, troubleshooting complex server issues, and configuring computer networks satisfies the 'computer employee' exemption."). The line between non-exempt troubleshooting and exempt troubleshooting appears to lie in how the employee approaches the problem and what level of knowledge must be brought to bear on the issue: troubleshooting is more likely to be considered exempt if the employee "has to be creative" and apply sophisticated technical knowledge to "come up with a solution," as opposed to employing "canned answers" to solve it. *Grills v. Hewlett-Packard Co.*, 88 F. Supp. 3d 822, 824 (N.D. Ohio Aug. 24, 2015); *see also Young v. Cerner Corp.*, No. 06-321, 2007 WL 2463205, at *5 (W.D. Mo. Aug. 28, 2007) (software engineer's job, which involved correcting defects in databases, was exempt because her task "was to apply some of her own analysis and judgment in resolving defects [with computer code].").

Ultimately, in applying this exemption, a court must examine whether the employee's duties are akin to those of a "computer systems analyst, computer programmer, [or] software engineer." 29 U.S.C. § 213(a)(17); *see also Hunter*, 453 F. Supp. 2d at 52. And in interpreting the scope of this exemption, a court may not narrowly construe it—as Plaintiff would prefer—but instead must give the exemption a "fair reading." *Flood*, 904 F.3d at 228.

Here, the Court concludes that genuine issues of material fact preclude summary judgment in Plaintiff's favor. Viewing the facts in the light most favorable to Defendant, Plaintiff's job duties primarily involved some combination of the activities listed in Section 213(a)(17). There is evidence that Defendant intended that the Senior Support Tech would generally involve troubleshooting and technical support, but of a more technically sophisticated level. Pierson

envisioned that the employee would "have responsibility for the design, manage[ment] and administration of complex systems" and would need to bring their "intellectual capital" to bear on upgrading and managing the college's technical infrastructure as a whole. ECF No. 49-7 at 1.

There is evidence that, in practice, Plaintiff's role was consistent with Pierson's vision. Hogan testified that Plaintiff was the architect behind the system that integrated Apple hardware with the college's network—Plaintiff designed the system, recommended the hardware to be used, installed the physical server, and configured the software. Even after the server was installed, maintaining the Apple environment was an "ongoing effort" that "took up a substantial amount of [Plaintiff's] time." ECF No. 49-8 at 44. Plaintiff would need to update the server and determine what capabilities and permissions should be available to users. *See id.* In this respect, Plaintiff had a unique skill set in the IT department. *See id.* at 30.

Beyond his work with Apple products, Plaintiff also helped to design and determine upgrades for A/V classroom technology early in his tenure, he reviewed and upgraded classroom technology during college breaks, and he participated in a committee that sought to develop and improve the college's event management system. Regarding his help-desk role, Plaintiff was tasked with solving more complex issues, including those involving servers and the college's network. Unlike Plaintiff, work-study students at the help desk solved only "easily-resolved problems" by reference to a predefined script. ECF No. 49-2 at 1.

In short, Defendant paints a picture of an IT professional whose day-to-day activities involved solving complex computer, server, and network issues by reference to his knowledge, training, and experience, and who helped to design and implement new technologies at the college. Defendant's key assertion is that Plaintiff played a significant role in designing and implementing

the Apple environment at the college,[2] had a unique skillset that allowed him to troubleshoot complex issues with the Apple Server and Apple products, and was a critical part of the ongoing effort to maintain the Apple server and configure the permissions and capabilities of Apple products to ensure they were integrated in the college's network. This evidence portrays Plaintiff as a technically sophisticated employee who not only solves complex problems related to the technological infrastructure of the college through his knowledge and ingenuity, but also advances the college's capabilities by designing and implementing new technologies. Even if Plaintiff spent much of his time on lesser-skilled tasks, a reasonable jury could conclude that he was "principally of value to [Defendant] because he had sophisticated knowledge of computing that went beyond that of a non-exempt Help Desk employee." *Bobadilla v. MDRC*, No. 03 Civ. 9217, 2005 WL 2044938, at *7 (S.D.N.Y. Aug. 24, 2005); *see also* 29 C.F.R. § 541.700(a) (stating that the "primary duty" is the "most important duty" that the employee performs).

Plaintiff counters that Defendant has not presented a genuine issue of material fact but has instead mischaracterized the evidence and "cloud[ed] the facts with baseless, general statements suggesting that [his] actual duties were very, very complex." ECF No. 53 at 9. The Court disagrees. To be sure, the evidence Defendant presented through Plaintiff's supervisors is, by and large, less detailed and clear than Plaintiff's own statements about his job duties. But the lack of specificity does not render Defendant's evidence so conclusory or speculative as to justify disregarding it—at most, that generality is something for the factfinder to consider in weighing those witnesses' credibility at trial.

---

[2] Plaintiff notes that his work on the Mac Server did not begin until Fall 2012. *See* ECF No. 53-1 at 4. For that reason, he states that even assuming "that a significant portion of [his] actual duties consisted of exempt work on the Mac server and environment after the fall of 2012, [he] was still improperly classified for the first two years of his employment." *Id.* But Hogan testified that Plaintiff managed the Apple environment even prior to that upgrade, and so there remains a genuine issue of material fact.

Likewise, the fact that Plaintiff has presented a voluminous paper trail of his work to corroborate his assertions would not preclude a reasonable factfinder from accepting the testimony of Plaintiff's supervisors. *Id.* at 5. In short, Plaintiff's mere belief that Defendant's evidence is not credible is not a basis for summary judgment. There are clear disputes of material fact—*e.g.*, whether Plaintiff designed the Apple server and its capabilities, whether Plaintiff's support duties generally involved complex problems that required the use of ingenuity and sophisticated technical knowledge, and whether Plaintiff's ongoing maintenance of Apple products on campus required advanced knowledge and experience—that the Court may not resolve at this stage. *See Soto v. Gaudett*, 862 F.3d 148, 157 (2d Cir. 2017) ("Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)).

Accordingly, taking the facts, and the reasonable inferences therefrom, in the light most favorable to Defendant, there are genuine issues of material fact as to whether Plaintiff was exempt from FLSA overtime requirements under the computer employee exemption.

## II. Administrative Exemption

"The FLSA also exempts from the overtime requirements 'any employee employed in a bona fide . . . administrative . . . capacity.'" *Sethi v. Narod*, 974 F. Supp. 2d 162, 181 (E.D.N.Y. 2013) (quoting 29 U.S.C. § 213(a)(1)). An employee is employed in such capacity if, *inter alia*, his primary duty (1) "is the performance of office or non-manual work directly related to the management or general business operations of the employer or the employer's customers"; and (2) "includes the exercise of discretion and independent judgment with respect to matters of significance." 29 C.F.R. § 541.200(a)(2), (3). "Work directly related to management or general business operations includes . . . computer network, internet and database administration." *Id.* §

541.201(b); *see also Mock v. Fed. Home Loan Mortg. Corp.*, No. 13-CV-1292, 2014 WL 3545096, at *7 (E.D. Va. July 15, 2014) (employee's work was "directly related to management or general business operations" where he "designed and implemented solutions" and "provided advice to upper-level management" regarding the "operation of the [business's] IT infrastructure").

As for the second prong, "the exercise of discretion and independent judgment involves the comparison and the evaluation of possible courses of conduct, and acting or making a decision after the various possibilities have been considered," while "matters of significance" refers to "the level of importance or consequence of the work performed." 29 C.F.R. § 541.202(a). To determine whether an employee acts with discretion and independent judgment, the following factors should be considered:

> [W]hether the employee has authority to formulate, affect, interpret, or implement management policies or operating practices; whether the employee carries out major assignments in conducting the operations of the business; whether the employee performs work that affects business operations to a substantial degree, even if the employee's assignments are related to operation of a particular segment of the business; whether the employee has authority to commit the employer in matters that have significant financial impact; whether the employee has authority to waive or deviate from established policies and procedures without prior approval; whether the employee has authority to negotiate and bind the company on significant matters; whether the employee provides consultation or expert advice to management; whether the employee is involved in planning long- or short-term business objectives; whether the employee investigates and resolves matters of significance on behalf of management; and whether the employee represents the company in handling complaints, arbitrating disputes or resolving grievances.

*Id.* § 541.202(b).

Importantly, "[t]he exercise of discretion and independent judgment must be more than the use of skill in applying well-established techniques, procedures or specific standards described in manuals or other sources." *Id.* § 541.202(e). Thus, in the realm of IT, an employee does not exercise discretion and independent judgment when he troubleshoots and solves computer problems by "following checklists, step-by-step instructions, troubleshooting policies, . . . the

13

instructions of system integrators, and existing documentation." *Strauch*, 2018 WL 4539660, at *7; *see also* DOL Opinion Letter, 2006 WL 3406603, at *4 ("Maintaining a computer system and testing by various systematic routines . . . are examples of work that lacks the requisite exercise of discretion and independent judgment . . . ."). Conversely, tasks involving the exercise of discretion and independent judgment include the design or development of a business's IT infrastructure, the development of computer or network policies, the determination of hardware needs, and, more generally, the "evaluation, comparison, and application of [the employee's] knowledge and experience free from immediate direction or supervision." *Mock*, 2014 WL 3545096, at *8-9; *see also* DOL Opinion Letter, 2006 WL 3406603, at *4.

As with the computer employee exemption, the Court concludes that summary judgment is not appropriate with respect to the administrative exemption. Viewing the facts in the light most favorable to Defendant, there are questions of fact as to whether Plaintiff's primary duty meets the exemption's requirements. Defendant proffers evidence showing that Plaintiff played a key role in developing and managing the Apple environment at the college—which, by the end of Plaintiff's employment, covered approximately 30% of the computers on campus. *See* ECF No. 49-9 at 8. As Defendant alleges, Plaintiff did not merely carry out orders or follow well-established protocols, but instead designed how the Apple environment would work and subsequently exercised independent judgment on how to calibrate and maintain that environment. Defendant has also presented evidence that Plaintiff took part in recommending and developing classroom and campus technologies. The mere fact that Plaintiff's decisions and recommendations were reviewed at a higher level and could not bind Defendant does not preclude application of the exemption. *See* 29 C.F.R. § 541.202(c) ("[E]mployees can exercise discretion and independent judgment even if their decisions or recommendations are reviewed at a higher level."). Finally,

there are sufficient facts from which a reasonable jury could conclude that these higher-level tasks were qualitatively, if not quantitively, Plaintiff's primary duty. Summary judgment is therefore inappropriate.

### III.    Motion to Strike

In support of his motion for summary judgment, Plaintiff submitted the declaration of Donald Reeve. The purpose of this declaration was to "explain[] the meaning and significance of a number of the general IT terms and phrases" and thereby counteract the allegedly misleading claims made by Defendant regarding Plaintiff's work. ECF No 53-1 at 5. Defendant moves to strike the declaration, arguing that Reeve is an undisclosed expert. ECF No. 54. The Court agrees.

To be admissible as lay opinion, a witness's testimony may not be "based on scientific, technical, or other specialized knowledge within the scope of Rule 702." Fed. R. Evid. 701(c). Testimony regarding industry practice or terminology constitutes specialized knowledge falling within the scope of Rule 702 if it is grounded in one's general knowledge of or experience in the industry. *See, e.g.*, *Bank of China, N.Y. Branch v. NBM LLC*, 359 F.3d 171, 182 (2d Cir. 2004) (concluding that witness's "explanations regarding typical international banking transactions or definitions of banking terms" were not admissible lay opinion because they "reflected specialized knowledge he has because of his extensive experience in international banking"); *ECD Investor Grp. v. Credit Suisse Int'l*, No. 14-CV-8486, 2017 WL 3708620, at *4 (S.D.N.Y. Aug. 28, 2017) (testimony that explained "the meaning of terms such as hedge ratios and delta-neutral hedging" was "inappropriate for lay opinion testimony"); *Victor G. Reiling Assocs. v. Fisher-Price, Inc.*, 406 F. Supp. 2d 171, 174 (D. Conn. 2005) (witness's testimony about "custom and practice in the toy industry and what is typical or standard in the toy industry" was not lay opinion testimony).

Consistent with this case law, Reeve's declaration is not admissible as lay opinion. Reeve has no substantive relationship to this case; his knowledge of the underlying facts is derived solely from his review of the summary judgment record. ECF No. 53-6 at 2. The purpose of his testimony is to clarify certain terminology employed by the parties and to explain typical or custom IT industry practices. *See, e.g.*, *id.* at 3-8. In other words, his opinions are not grounded in his "personal familiarity with the facts of [the] case," but his "specialized or technical knowledge." *Dynamic Concepts, Inc. v. Tri-State Surgical Supply & Equip. Ltd.*, 716 F. App'x 5, 11 (2d Cir. 2017) (summary order). Thus, Reeve's testimony is that of an expert, not a layperson.

Therefore, Plaintiff was required to disclose Reeve's identity by the deadline established in the scheduling order. Because Plaintiff did not do so, the Reeve declaration is subject to preclusion under Federal Rule of Civil Procedure 37(c)(1): "If a party fails to provide information or identify a witness as required . . . the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1).

"To determine whether preclusion of testimony under Rule 37 is an appropriate sanction for failure to meet disclosure requirements," the court considers four factors: "(1) the party's explanation for the failure to comply with the discovery order; (2) the importance of the testimony of the precluded witness; (3) the prejudice suffered by the opposing party as a result of having to prepare to meet the new testimony; and (4) the possibility of a continuance." *Dynamic Concepts*, 716 F. App'x at 12.

Preclusion is the appropriate remedy under these circumstances. First, Plaintiff's explanation for his untimely disclosure is unconvincing. While Plaintiff claims that the need for Reeve's testimony only became necessary when "Defendant attempted to obfuscate the facts" in

16

its opposition to summary judgment, the record shows that Defendant's claims are not novel or surprising. ECF No. 58-1 at 5. In its Answer, Defendant claimed that Plaintiff was exempt from overtime under the computer employee and administrative exemptions, and it alleged that Plaintiff's position involved "highly skilled tasks" and responsibilities such as "systems administrator for the College's Mac computer network." ECF No. 14 at 3-4. In their June and July 2018 depositions, Defendant's witnesses testified to like effect. For example, Hogan identified Plaintiff as the architect of the college's Mac server, and Pierson discussed his vision for a technically sophisticated Senior Support Tech position. Consequently, the need for expert testimony to demystify Plaintiff's duties and counter Defendant's characterizations would have been apparent much earlier than summary judgment.

Second, insofar as Plaintiff himself describes the nature and simplicity of his duties, the Reeve declaration is largely cumulative and unimportant.

Third, permitting such testimony would prejudice Defendant, because it would be forced to contest Reeve's assertions without the benefit of any investigation or discovery.

Accordingly, preclusion is appropriate, and the Court has not considered the Reeve declaration in evaluating Plaintiff's summary judgment motion.[3]

---

[3] Plaintiff also requests, in the alternative, that the Court modify the scheduling order and reopen expert discovery. *See* ECF No. 58-1 at 16. Plaintiff's request is denied. For the reasons stated above, Plaintiff has not demonstrated the diligence necessary to justify that relief. *See F.D.I.C. v. Horn*, No. 12-5958, 2015 WL 1611995, at *5-6 (E.D.N.Y. Apr. 8, 2015) (stating standard for modification of a scheduling order). Moreover, further delays would prejudice Defendant: this case is already three years old, and further expert discovery would likely "derail the trajectory of this case away from potential resolution." *Id.* at 14.

## CONCLUSION

For the reasons discussed above, Plaintiff's motion for summary judgment (ECF No. 42) is DENIED, Defendant's motion to strike (ECF No. 54) is GRANTED, and Plaintiff's motion to reopen expert discovery (ECF No. 58) is DENIED. By separate order, the Court will schedule a status conference to hear from the parties on the progress of this action.

IT IS SO ORDERED.

Dated: August 14, 2019
      Rochester, New York

HON. FRANK P. GERACI, JR.
Chief Judge
United States District Court